WordPerfect Document Compare Summary

Original document:  E:\Documents\40107-2\2023\D Ct\032423_Petn.wpd
Revised document:  E:\Documents\40107-2\2023\D Ct\061323_Petn_clean.wpd
Deletions are shown with the following attributes and color:
     ~~Strikeout~~, Blue   RGB(0,0,255).
     Deleted text is shown as full text.
Insertions are shown with the following attributes and color:
     <u>Double Underline</u>, Redline, Red   RGB(255,0,0).


The document was marked with 145 Deletions, 177 Insertions, 0 Moves.

Constance E. Brooks (*pro hac vice ~~pending~~*)
cbrooks@fwlaw.com
Danielle Bettencourt (WY Bar No. 8-6782)
dbettencourt@fwlaw.com
FAIRFIELD & WOODS, P.C.
1800 California Street, Suite 2600
Denver CO 80202-2645
P: (303) 894-4431 F: (303) 830-1033

Galen West (WY Bar No. 5-1453)
West Law Office, P.C.
P.O. Box 1020
Rock Springs, WY 82902
galen.west@westlawofficepc.com
P: (307) 362-3300

Counsel for Petitioner

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| ROCK SPRINGS GRAZING ASSOCIATION, a Wyoming Corporation | ) ) ) |
| Petitioner, | ) ) |
| v. | ) ) ) |
| U.S. DEPARTMENT OF THE INTERIOR, an agency of the United States of America; DEB HAALAND, Secretary of the Department of the Interior, in her official capacity; TRACY STONE-MANNING, Director of the Bureau of Land Management; in her official capacity; Bureau of Land Management, a division within the Department of the Interior | ) ) ) ) ) ) ) ) ) ) |
| Respondents. | ) ) |

Ci~~vil No.~~ **~~PETITION FOR RELIEF TO ENFORCE THE CONSENT DECREE IN~~**

*~~ROCK SPRINGS GRAZING ASSOCIATION v. SALAZAR,~~* ~~Case No. 2:11-CV-00263-NDF AND~~23-00048 NDF

**AMENDED PETITION TO ENFORCE RIGHTS UNDER** SECTION 4 OF THE WILD FREE-ROAMING HORSES AND BURROS ACT [PROPOSED]

## INTRODUCTION

~~T~~Pursuant to Rule 15(a)(1) of the Federal Rules of Civil Procedure, Petitioner, t~~he Rock Springs Grazing Association ("RSGA"), by and through counsel, files this *Amended* Petition to Enforce ~~the~~ rights under Section 4 of the Wild Free-Roaming Horses and Burros Act ("WHA") for a declaratory judgment and order directing the Respondents Department of the Interior and the Bureau of Land Management (BLM) to cease and desist from managing wild horses on the private lands on the Wyoming Checkerboard and remove the wild horses from private lands owned and leased by RSGA.[1] RSGA revoked its express consent to allow wild horses on its land almost 13 years ago. As of fall 2022, BLM recorded 4,434 wild horses within the herd management areas (HMAs), which currently include the Wyoming Checkerboard and "solid block" public lands located in southwestern Wyoming. This census excluded the Checkerboard and public lands outside of the HMA boundaries, which suggests there are additional uncounted wild horses. The wild horse numbers are three-times the estimated number of wild horses in 1971, when Congress first enacted the WHA.

1.      On May 8, 2023, more than a month after this Petition was filed, BLM released the Record of Decision and Approved Resource Management Plan Amendment for Wild Horse Management for the BLM Rock Springs and Rawlins Field Offices (Wild Horse ROD). The Wild Horse ROD is intended to implement the terms of the 2013 Consent Decree issued by this Court on April 4, 2013 in *Rock Springs Grazing Ass'n v. Salazar*, Civ. No. 2:11~~-~~-0263 NDF; ECF Nos. 92, 92~~-~~-1; *see also Rock Springs Grazing Ass'n v. Salazar*, 935 F. Supp. 2d 1179 (D. Wyo. 2013) ("~~*RSGA*"~~*RSGA* ~~*v. Salazar"). RSGA also seeks an order pursuant to Section 4 of the Wild Free-*~~

---

[1]      Rule 15(a)(1) permits the filing of a one-time amended pleading before Respondent has filed a responsive pleading.

*Roaming Horses and Burros Act ("WHA") directing BLM to remove wild horses from* Salazar"). While the Wild Horse ROD retained the White Mountain Herd Management Area (White Mountain HMA) it removed the condition that the herd would be managed as a non-reproducing herd and instead provided that BLM would continue to use existing fertility controls. RSGA's consent to allow wild horses on the private lands on the Wyoming Checkerboard and remove in the White Mountain HMA was conditioned on BLM's agreement to manage the herd "as a non-reproducing herd by utilizing fertility control and sterilization methods to maintain a population of 205 wild horses and to initiate gathers if the population exceeds 205 wild horses." *RSGA v. Salazar*, ECF No. 92-1, ¶6d. The modification of this condition in the ROD makes it untenable to allow wild horses in this area due to the lack of fenced boundaries between White Mountain HMA and the adjacent RSGA lands to the east and south of the HMA. The BLM's proven failure to maintain wild horse numbers over the past years and its inability to implement effective fertility controls make it even more unlikely that BLM will honor this condition. RSGA revoked its consent for the White Mountain HMA on May 15, 2023 and again demanded that BLM act promptly to remove the wild horses. BLM has not acknowledged the letter revoking consent to keep wild horses on the private lands owned and leased by RSGA from the herd management areas (HMAs) previously designated pursuant to RSGA's express consent, which was revoked 12 and a half years ago. within the White Mountain HMA.

2.      For the ten years that the 2013 Consent Decree was in effect, BLM failed to comply with Paragraphs 1,2 and 4 of the 2013 Consent Decree by not gathering issued by this Court on April 4, 2013 in *Rock Springs Grazing Ass'n v. Salazar*, Civ. No. 2:11-0263 NDF; ECF Nos. 92, 92-1; see

also *Rock Springs Grazing Ass'n v. Salazar*, 935 F. Supp. 2d 1179 (D. Wyo. 2013) ("*RSGA v. Salazar*"). BLM failed to remove wild horses from the Wyoming Checkerboard and RSGA's private lands to conform to RSGA's rights under Section 4 of the ~~Wild Free-Roaming Horses and Burros Act ("WHA") and by failing~~WHA. BLM also failed to complete the land use plan amendments to remove the private land from the affected HMAs and to revise the wild horse numbers to conform to the changes in the HMAs. BLM also failed to adjust its work plans to gather wild horses when the numbers exceeded AML, which undoubtedly caused the exponential increase in wild horse numbers.

3.      The decisions of this Court, the Court of Appeals for the Tenth Circuit, and the 2013 Consent Decree recognize that wild horses move freely between public and private land sections in the Wyoming Checkerboard and BLM cannot meet RSGA's rights under Section 4 without removing both the public and the private lands from wild horse management. While the BLM completed the plan amendment and Final Environmental Impact Statement (FEIS) by December 2020, it did not release the ~~documents~~proposed plan and FEIS until May 6, 2022, 15 months later. BLM resolved all protests by September 7, 2022 but ~~is delaying~~delayed the ~~Record of Decision~~Wild Horse ROD until May 8, 2023 after expiration of the 2013 Consent Decree. ~~The BLM also announced there will not be any gathers even though the November 2022 infra-red census proved that there are more than 4,443 wild horses in the Rock Springs Field Office HMAs or more than three times the number allowed under the current Green Rive Resource Management Plan adopted in 1997. RSGA believes that there are more wild horses outside the HMA boundaries on the Checkerboard as well as public lands, which were not counted in the infra-red census. The recorded totals are three times the agreement in 1979 to manage for 1500 wild horses or the estimated number of wild horses in the~~

District when Congress enacted the WHA and the same number adopted in the BLM land use plans, before RSGA revoked its consent to include its lands in the HMAs.

RSGA asks this Court to find that BLM did not comply with the 2013 Consent Decree by failing to timely complete the plan revision and to implement the removal of RSGA lands from wild horse management. BLM has further violated RSGA's rights under Section 4 of the WHA by continuing to manage the Wyoming Checkerboard, including RSGA lands for wild horses and by failing actually to remove and will not implement removal of the wild horses, as opposed to "trying," without regard to the threat.

4.      BLM signed the Wild Horse ROD May 8, 2023. Two days later or on May 10, 2023 the American Wild Horse Campaign, Animal Welfare Institute, Western Watersheds Project, and several individuals filed suit to set aside the land use plan amendments and to keep wild horses on the Wyoming Checkerboard regardless of the lack of consent. *American Wild Horse Campaign et al. v. Stone-Manning, et al.*, Civ. No. 23-0084 NDF (D. Wyo.).

5.      The BLM will not initiate any gathers in the Rock Springs Field Office even though the November 2022 infra-red census proved that there are more than 4,443 wild horses in the Rock Springs Field Office HMAs or more than three times the number allowed under the current Green River Resource Management Plan (RMP) adopted in 1997. RSGA is of the information and belief that there are more wild horses outside the HMA boundaries on the Checkerboard and the solid block public lands, which were not counted in the infra-red census. To put the wild horse numbers in perspective, the total number of wild horses recorded in fall of 2022 are three times the agreement

in January 1979 to manage for 1500 wild horses or the estimated number of wild horses in the District when Congress enacted the WHA.

6.      RSGA asks this Court to find that BLM violated RSGA's rights under Section 4 of the WHA by continuing to manage the Wyoming Checkerboard, including RSGA private lands for wild horses and by failing to actually remove the wild horses, notwithstanding the documented threats to rangeland resources and wildlife habitat. RSGA also asks this Court to direct BLM to remove the wild horses from the private lands and to cease and desist from managing the private lands within the Checkerboard for HMAs or a certain number of wild horses. The WHA does not permit BLM to manage wild horses on private land without the consent of the landowner. RSGA revoked its consent on October 4, 2010. In the alternative, RSGA asks the Court to extend the 2013 Consent Decree to compel BLM to adhere to its original commitments.

## JURISDICTION AND VENUE

7.      This action is brought pursuant to Rule 70 of the Federal Rules of Civil Procedure, Section 4 of the Wild Free-Roaming Horses and Burros Act (WHA), 16 U.S.C. §1334; and the Administrative Procedure Act (APA), 5 U.S.C. §706. Paragraphs 9 and 10 of the Consent Decree vested continuing jurisdiction in this Court to enforce the terms of the Consent Decree.

8.      This Court has jurisdiction under 28 U.S.C. §1331 [federal question] and the APA, 5 U.S.C. §§701-706. Petitioner seeks declaratory and injunctive relief, 28 U.S.C. §2201 [declaratory judgment], and a writ of mandamus, 28 U.S.C. §1361 [mandamus], and the APA, 5 U.S.C. §§701-706.

*RSGA Petition Under Section 4 of the WHA to Remove*
                                    *Wild Horses and Private Land Interests from Wild Horse Management*

~~A consent decree is an agreement of the parties and is also "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees" of a court. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) (*quoting Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992)). Federal consent decrees must spring from and resolve a dispute within the court's subject-matter jurisdiction, must come within the general scope of the case as set forth in the pleadings, and must further the objectives of the law in which the complaint was based. *Id.* (*citing Firefighters v. Cleveland*, 478 U.S. 501, 525 (1986)). A district court retains jurisdiction to enforce a consent decree as long as the parties' agreement or the court order dismissing the action reserves jurisdiction to enforce compliance. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994); *accord. Pigford v. Vilsack*, 777 F.3d 509, 514 (D. D.C. 2015).~~

~~This Court previously concluded that it had subject matter jurisdiction to enter the Consent Decree. *RSGA v. Salazar*, 935 F. Supp. 2d at 1186. The 2013 Consent Decree also provided for continuing jurisdiction with respect to any dispute arising under the Consent Decree and any alleged violation of the Consent Decree. ECF No. 92-1, 2013 Consent Decree at ¶ 8. In this Court's order granting dismissal and approving the Consent Decree, it also "incorporated by reference" . . . "all the provisions in the Consent Decree" and retained "continuing jurisdiction of this action consistent with the terms of the Consent Decree." *RSGA v. Salazar*, 935 F. Supp. 2d at 1191. Therefore, this Court has jurisdiction to enforce the 2013 Consent Decree.~~ <u>to compel compliance with federal law.</u>

9.      Venue is properly laid in the District Court for the District of Wyoming.  28 U.S.C. §1391(e).  The land and wild horses that are the subject of this action are located in Wyoming.  The Plaintiff RSGA is incorporated in Wyoming and has its principal place of business in Rock Springs, Wyoming.

**PARTIES**

10.     Petitioner RSGA was incorporated in 1907 in order to assemble the land rights to use the rangeland resources within a portion of the Wyoming Checkerboard, which at that time was owned by the United States, the Union Pacific Railroad, and the State of Wyoming.  The original shareholders of RSGA formed the corporation to gain control of the private land through continuously-held Union Pacific Railroad surface leases for only grazing and haymaking to protect and manage grazing within this area. The private lands owned and leased by RSGA are located within the "Wyoming ~~Checkerboard,"~~ Checkerboard" and were originally patented under the Union Pacific Railroad Land Grant in southwest Wyoming. The grazing lease continues with the current surface landowner~~s~~ Aggie Grazing LLC, Wild Cat Coal Company, and Anadarko Land Company.

11.     The Wyoming Checkerboard where the RSGA lands are located consists of a strip of land divided into one-mile square sections located in southwestern Wyoming.  The RSGA lands follow the railroad right-of-way from Tipton to Granger, Wyoming encompassing an area roughly 40 miles wide and 80 miles long, 3200 square miles or about two million acres.

12.     In 1935, Congress enacted the Taylor Grazing Act (TGA), 43 U.S.C. §§315-315r, which directed the Department of the Interior, through the General Land Office, and later the BLM, to manage public land grazing through the issuance of grazing permits or leases.  Following

enactment of TGA, RSGA secured the grazing preference on the public lands adjacent to the RSGA lands and continues to hold the grazing permit for the adjoining federal lands.

13.     These private and public lands are included within the boundaries of the BLM Rock Springs Grazing Allotment. This allotment, which is the largest single grazing allotment managed by BLM, encompasses an area slightly more than two million acres of private and public land with few fences and a long history of winter grazing for sheep and wildlife, and wild horses year round. The RSGA deeded land and grazing and agricultural surface leases from Aggie Grazing LLC represent about 51% of the permitted area. Aggie Grazing LLC is the ~~current~~majority owner of the surface rights to the odd-numbered sections in the Wyoming Checkerboard, while Wild Cat Coal Company and Anadarko Land Corporation own other sections.

14.     The BLM administers the alternating even-numbered sections of public land. These sections plus the state land sections and scattered parcels of private land account for the balance of the land within the Wyoming Checkerboard.

15.     ~~Defendant~~Respondent Deb Haaland is the Secretary of the DOI. In her official capacity, the Secretary is responsible for upholding the Constitution of the United States, implementing the federal laws, and for setting public land policy in accordance with the provisions and requirements of federal law, including Wild Free-Roaming Horses and Burros Act and the Federal Land Policy and Management Act (FLPMA).

16.     ~~Defendant~~Respondent the Department of the Interior (DOI) is the department of the federal government to which Congress delegated the authority to administer the laws governing the

*RSGA Petition Under Section 4 of the WHA to Remove*
*Wild Horses and Private Land Interests from Wild Horse Management*

public lands and wild horses in accordance with the Constitution of the United States and federal law.

17.     ~~Defendant~~Respondent Tracy Stone-Manning is the Director of the BLM. In her official capacity, Director Stone-Manning is responsible for managing the public lands in accordance with the U.S. Constitution and federal law.

18.     ~~Defendant~~Respondent the Bureau of Land Management is the federal agency within DOI responsible for the management ~~and conservation of~~of public land resources on 253 million surface acres, as well as 700 million acres of onshore subsurface mineral estates, including the public lands and wild horses in Wyoming.

## STATEMENT OF FACTS

*Background of the Case and 2013 Consent Decree*

19.     Following Congress' enactment of the WHA in 1971, RSGA witnessed the ~~an~~ exponential increase in wild horses, which led to the degradation of the range resources on public lands and RSGA private lands. RSGA formally requested removal of all of the wild horses from its private lands on the Wyoming Checkerboard pursuant to Section 4 of the WHA in 1977. *RSGA v. Salazar*, 935 F. Supp. 2d at 1183.

20.     In January of 1979, RSGA met with International Society for the Protection of Mustangs and Burros and Wild Horses Yes! to discuss BLM's failure to successfully gather wild horses and to discuss the number of horses that should be within the Rock Springs District. The parties agreed to 1,500 horses within the entire District and RSGA agreed to tolerate 500 horses on the Checkerboard on the condition that BLM proved that it was capable of scheduling and implementing gathers to maintain these numbers. *See Mountain States Legal Found. v. Andrus*, No.

79-cv-275K (D. Wyo. Mar. 13, 1981) ("*MSLF*"); *RSGA v. Salazar*, 935 F. Supp. 2d at 1183 n. 4 (discussing the 1979 agreement).

21.     RSGA sued BLM when it abruptly shut down its gather program in June 1979 and cancelled the planned gather. *RSGA v. Salazar*, 935 F. Supp. 2d at 1183 n. 4. In 1981, the District Court found that "the wild horse population has dramatically increased" and ordered the BLM to "within one year from the date of this Order remove all wild horses from the checkerboard grazing lands in the Rock Springs District except that number which the RSGA voluntarily agrees to leave in said area." *Id.*; *MSLF*, No. 79-cv-275K (D. Wyo. Mar. 13, 1981).

22.     With completion of an environmental statement, the parties agreed to amend the 1981 Order in 1982 to reflect the designated HMAs in the Rock Springs District and the appropriate management levels (AMLs) assigned to each HMA for a total of 1,525 wild horses. *RSGA v. Salazar*, 935 F. Supp. 2d at 1183. These HMAs included both public and private land based on RSGA's consent and subject to the condition that BLM manage these areas for not more than 1,525 wild horses and prove that it was capable of maintaining these numbers.

23.     When BLM failed to gather the wild horses as ordered, RSGA sought enforcement of the Court's order in 1984. BLM agreed to gather wild horses to reach the target of 1,500 to 1,600 horses and to dedicate 90 percent of its funding to achieve AMLs in Adobe Town ("AT"), Salt Wells Creek ("SW"), White Mountain, and Great Divide Basin ("GDB") HMAs for the following three years. *Id.*

24.     Despite achieving the agreed-upon number after gathers in 1985, BLM again paused regular gathers in the 1990s and this led to an exponential increase in wild horse numbers throughout

Wyoming. In August 2003, the State of Wyoming filed suit to enforce the ~~terms of~~wild horse numbers established in the governing land use plans, which incorporated the HMA designations and AMLs for each Wyoming HMA. *Id.* at 1184. The BLM and the State entered into a consent decree whereby BLM agreed to maintain AMLs and to gather to low AML every three years. *Id.* The implementation of the consent decree was short lived – BLM, again citing budget constraints, suspended gathers for three years (2007-2009 or until 2010) and allowed the Consent Decree to expire without ever meeting the stated objectives. *Id.*

25.     When the State again sued to compel compliance with wild horse numbers set out in the land use plans, BLM sought dismissal on the grounds it could not be compelled to comply with the wild horse numbers established in the land use plans. *State of Wyoming v. U.S. Dept. of the Interior*, 839 F.3d 938, 942 (10th Cir. 2016) (affirming dismissal on the basis the State lacked standing to compel ~~compliance when land use plan AMLs because compliance with the land use plans was not mandatory and BLM retained discretion to determine, if and when, it would gather.)~~BLM to initiate a wild horse gather when wild horses exceeded AMLs because there was no legal duty to gather). *Id.* at 942.

26.     RSGA withdrew its consent to tolerate any wild horses on its land and demanded that BLM remove all wild horses from lands it owned or leased pursuant to Section 4 of the WHA by letter dated October 4, 2010. *Id.* BLM responded that its budget and intervening priorities prohibited immediate work on the Adobe Town, Salt Wells, White Mountain, and Great Divide Basin HMAs and that the current land use plan authorized wild horses on RSGA lands. *RSGA v. Salazar*, 935 F.

Supp. at 1184-85. BLM also made no commitment to remove horses from RSGA lands, even though BLM no longer had RSGA's consent to maintain wild horses on the private lands. *Id.* at 1185.

27.     RSGA filed suit on July 27, 2011 to enforce its right to require removal of the wild horses from the private lands and removal of the included private lands from the HMA boundaries. *Id.*

28.     BLM and RSGA resolved the lawsuit in the 2013 Consent Decree, which was approved and made part of this Court's order dismissing the case on April 3, 2013. ECF No. 92-1; *RSGA v. Salazar,* at 1191. In the 2013 Consent Decree, the BLM agreed to remove all wild horses located on RSGA's private lands including the Checkerboard lands with the exception of those wild horses found within the White Mountain HMA, which was to be managed as non-reproducing for up to 205 wild horses. *RSGA v. Salazar*, ECF No. 92-1, 2013 Consent Decree at ¶ 1¶¶ 1, 6(d). Notwithstanding the BLM budgetary constraints, the 2013 Consent Decree required BLM to adjust its annual work plans to gather horses if census data showed AMLs would be exceeded. *Id.* at ¶ 4. No later than November 30 of each year, the BLM iswas to report to RSGA on the results of the wild horse census areas for the HMAs, meet with RSGA to discuss the results, and provide RSGA notice of any gathers to remove wild horses. *Id.* at ¶ 3.

29.     The 2013 Consent Decree also provided for BLM to initiate resource management plan amendments to convert the Salt Wells and Great Divide Basin HMAs to herd areas, thereby no longer managing the private lands for wild horses, and to delayschedule gathers untilwhen theyre were up to 200 wild horses in the Salt Wells herd area and up to 100 wild horses in the Great Divide Basin herd area. *Id.* at ¶¶ 6a-b. The Adobe Town HMA boundaries were to be revised to exclude the

Checkerboard lands (about 42,000 acres) and the AML would be changed to 225-450 wild horses or lower, to reflect the redacted land. The White Mountain HMA would be managed as a non-reproducing herd with a population not to exceed 205 wild horses. *Id.* at ¶¶ 1, 6c-d.

30.     Finally, BLM committed to gathering and removing wild horses from Checkerboard lands within Adobe Town-Salt Wells HMAs in 2013, Great Divide Basin HMA in 2014, White Mountain HMA in 2015, and an additional gather in 2016 if necessary to achieve the numbers identified in Paragraphs 1 and 4 of the 2013 Consent Decree.  *Id.* at ¶ 5. BLM also agreed that it would adjust its work plans to gather wild horses from the Checkerboard when the numbers exceeded AML.

31.     The ~~Consent Decree gave the~~ Court retained "continuing jurisdiction over this matter with respect to any dispute arising under this Consent Decree and any alleged violation of this Consent Decree." *Id.* at ¶ 8. If a dispute arises, the 2013 Consent Decree requires written notice of the matter in dispute and an attempt to resolve the dispute informally for a period of 30 days from the date of the notice. *Id.* at ¶ 9. The 2013 Consent Decree ~~does not terminate until~~ terminated 10 years after the entry of the decree. *Id.* at ¶ 11. ~~In t~~This Court's ~~approval of~~ order of dismissal also affirmed the 2013 Consent Decree and ~~order dismissing the case, the Court~~ incorporated all provisions of the Consent Decree ~~in its order and "retain[ed] continuing jurisdiction of this action consistent with the terms of the Consent Decree."~~ *RSGA v. Salazar*, 935 F. Supp. 2d at 1191.

*Actions Following Court Approval of the 2013 Consent Decree*

32.     The BLM gather in fall of 2013 authorized the removal of 586 horses from the Adobe Town-Salt Wells Complex and all wild horses on private lands in those HMAs. Adobe Town-Salt

Wells HMA Wild Horse Gather EA at 9. The BLM also proposed to treat approximately 250 mares with Porcine Zona Pellucida ("PZP") – a fertility control drug. *Id.*

33.    At the completion of the gather, RSGA determined that BLM left several hundred wild horses on the Checkerboard, released about 40 wild horses onto State land sections adjacent to the south Checkerboard boundary and private land, and returned another 80 wild horses to the Adobe Town-Salt Wells HMAs to ensure BLM had not gathered more wild horses than the gather number stated in the EA. BLM only treated about 40 mares with PZP instead of the 250 stated in the EA.

34.    RSGA sent a notice of violation in February 2014 objecting to the number of wild horses not gathered from the Wyoming Checkerboard, the return of 40 wild horses to a state school land section, and return of additional wild horses ~~to~~within a few miles ~~from~~of the boundary of the Wyoming Checkerboard. BLM acknowledged the problems in its response ~~in~~on May 12, 2014.

35.    The 2014 spring aerial census recorded 806 horses on the Checkerboard including the Great Divide Basin, Salt Wells, and Adobe Town HMAs. Decision Record for Wild Horse Gather in Great Divide Basin, Salt Wells, and Adobe Town HMAs at 1 (July 18, 2014). Both the Great Divide Basin and Salt Wells HMAs were 680 horses above low AML. Categorical Exclusion for Wild Horse Gather in Great Divide Basin, Salt Wells, and Adobe Town HMAs at 3 (July 18, 2014). In light of these numbers and RSGA's notice of non-compliance, BLM ~~elected~~cited only Section 4 of the WHA as authority to gather all of the wild horses from the Checkerboard lands ~~pursuant to Section~~rather than citing both Sections 3 and 4 of the WHA. In all previous gathers, BLM cited Sections 3 and 4 of the WHA. BLM also ~~based~~approved  the decision ~~on~~using a categorical exclusion rather than the customary EA. Decision Record for Wild Horse Gather in Great

*RSGA Petition Under Section 4 of the WHA to Remove Wild Horses and Private Land Interests from Wild Horse Management*

Divide Basin, Salt Wells, and Adobe Town HMAs at 1 (July 18, 2014). Because RSGA consented to wild horses in the White Mountain HMA, no gather occurred there or on the solid block public lands within each HMA. Categorical Exclusion for Wild Horse Gather in Great Divide Basin, Salt Wells, and Adobe Town HMAs at 2 (July 18, 2014).

36.     Wild horse advocacy groups challenged the gather on August 1, 2014 on the grounds that any wild horse gather had to comply with Section 3 of the WHA and the Green River and Rawlins Resource Management Plans adopted pursuant to the Federal Land Policy and Management Act. *Am. Wild Horse Pres. Campaign v. Jewell*, Civ. No. 14-152, ECF No. 1 (*AWHPC v, Jewell*); *Am. Wild Horse Pres. Campaign v. Jewell*, 847 F.3d 1174, 1182 (10th Cir. 2016) ("*AWHC v. Jewell*"). This Court denied the preliminary injunction and BLM removed a total of 1,263 wild horses by October 9, 2014. BLM assumed the April 2014 census was accurate and in a declaration filed with the District Court, BLM stated that the wild horse numbers in the Salt Wells and Great Divide Basin HMAs dropped below AML. *AWHPC v. Jewell*, ECF No. 58-1, ¶7. The declaration was not based on a census or any on the ground verification, did not take into account wild horses located on public lands outside of the Checkerboard but within the HMAs, or the documented undercount when counting wild horses and wildlife from the air.

37.     RSGA argued that the mandates in Section 4 of the WHA superseded AML overrode Section 3 discretion to manage wild horses on public lands and that BLM need only determine that the wild horses were excess and the gather necessary to achieve a thriving natural ecological balance. In the Tenth Circuit briefing, RSGA also relied on the BLM census flights in April 2015 – a few months later – which proved that wild horse numbers did not drop below AML notwithstanding the

*RSGA Petition Under Section 4 of the WHA to Remove*
                                        *Wild Horses and Private Land Interests from Wild Horse Management*

Checkerboard gather. Wild horses in the Great Divide Basin, Adobe Town, and Salt Wells HMAs were all substantially above low AML, contradicting the ~~BLM~~ earlier declaration filed by the BLM. 2015 Census at 2 (June 24, 2015). Without the benefit of the 2015 Census results in March 2015, this Court found that BLM had violated NEPA but did not violate the WHA or FLPMA. *AWHC v. Jewell*, 847 F.3d at 1182-83.

38.     BLM cancelled the 2016 gather~~,~~ when the Tenth Circuit reversed this Court's decision on the 2014 gather. *AWHC v. Jewell*, 847 F.3d at 1188-90. ~~The~~Relying on the BLM inaccurate declaration, the Court held that wild horse numbers had dropped below AML in violation of the land use plan. *Id.* at 1189-90. As to the WHA claim, the Tenth Circuit held that both Section 3 and Section 4 are clear and unambiguous and that nothing in the Act allows BLM to ignore either a removal request from a private landowner or the public land duties in Section 3. *Id.* at 1188, 1191. The Tenth Circuit reprimanded the BLM for failing to come up with a viable solution, even though management of the Checkerboard may prove difficult. *See id.* at 1192 (The BLM must "go back to step one and make appropriate judgements by redetermining the HMAs without the non-permissive use of private lands." (J. McKay concurring)).

39.     The wild horse advocacy groups ~~again~~also challenged the BLM October 2017 wild horse gather due to the failure to count the dependent foals in the "excess" determination under the WHA and concerns that the gather would cause the herds to drop below AML. *See Am. Wild Horse Campaign v. Zinke*, 2017 WL 11450184, *1 (D. Wyo. Oct. 13, 2017). On January 9, 2019, this Court found that BLM's decision was arbitrary and capricious for failing to explain the policy of not counting foals for purposes of determining compliance with AML and how it determined the specific

number of "excess" horses. *Am. Wild Horse Campaign v. Zinke*, Case No. 2:17-cv-00170-NDF, Doc. No. 66 at 9-11 (Jan. 9, 2019). The Court remanded the 2017 Decision Record and EA. *Id.* at 11. While RSGA intervened to support the proposed gather, it pursued its concerns that the EA failed to adequately analyze or disclose the role of foals in the census or the gather ~~and~~. RSGA also objected to the failure to count foals in the determination of excess horses for the gather, given the delays between the census and actual removal and how that resulted in BLM never achieving its wild horse management objectives.

40.    In November 2017, BLM ~~accepted~~with RSGA's ~~recommendation and~~urging, performed a post-gather census from November 8 to November 15, 2017 less than a month after the gather concluded. 2017 Census (Jan. 30, 2018). The census found that there were 618 adult horses in the Great Divide Basin HMA (AML 415-600), 585 adult~~s~~ horses in Adobe Town HMA (AML 610-800), and 531 horses in the Salt Wells HMA (AML 251-305). *Id.* at 2-4. The census proved that wild horses remained on the Checkerboard and the numbers exceeded the high AML for the Salt Wells and Great Divide Basin HMAs. The post-gather census disproved claims that wild horses were permanently removed from the public lands or that the numbers did not comply with the BLM land use plans.

41.    BLM suspended all gathers in the Rock Springs Field Office from 2017~~7~~8 to 2021. The ~~a~~fall gather in 2021 (FY 2022) necessitated the removal of more than 3,555 excess wild horses or more than double the established high AML to "maintain a thriving natural ~~ecological~~ balance." Wild Horse Gather to AML on AT, SW, GDB, White Mountain and Little Colorado HMAs EA (Mar. 2021).

*RSGA Petition Under Section 4 of the WHA to Remove Wild Horses and Private Land Interests from Wild Horse Management*

42.    BLM policy is to not count foals for purposes of meeting AML, determining if the number of wild horses are excess and the number to be gathered. The 2022 gather EA did not count for the foals when deciding the number of wild horses to be gathered. When BLM gathered wild horses in the fall of 2021, it counted each foal as an adult, ~~thus leaving 20% to 35% additional wild horse foals which were soon to be adults on the Checkerboard and throughout the Field Office. These wild horses were not counted for purposes of setting the number of wild horses that were excess and would be gathered~~. By counting the foals as adults when gathered but not counting the ~~foals earlier or adjusting for the~~same foals in the gather plan, BLM reduced the effectiveness of its gather efforts by the annual foal crop of 20% to 35%. ~~The upper level of 35% increase is based on~~This was especially true for the FY 2022 gather, When BLM had no current inventory of wild horses and calculated the wild horse numbers using an estimate of 20% annual increase. Previously the U.S. Geological Survey ~~findings~~analysis noted that herd numbers in some Wyoming HMAs increased as much as 35% a year.

43.    ~~In~~To improve wild horse inventory accuracy, in the fall of 2022, BLM conducted an infra-red census of only the private and federal land within the HMA boundaries ~~to address the need for improved census techniques~~. The infra-red census enabled verification of the number of wild horses sighted from the planes. The infra-red census results presented to RSGA in February 2023 ~~show that there are at least~~documented 4,443 wild horses in the Rock Springs Field Office HMAs and a significant number are located on the Checkerboard. The infra-red census did not count wild horses on the Checkerboard lands ~~that are not part of an HMA. Nor did the census map wild horses on public lands not within an HMA~~or the public lands outside HMA boundaries. Thus, the 4,443

*RSGA Petition Under Section 4 of the WHA to Remove Wild Horses and Private Land Interests from Wild Horse Management*

number is not a complete census of all wild horses in the Rock Springs Field Office or of the number of wild horses on the Checkerboard.

*Plan Revision Process Mandated in the 2013 Consent Decree Characterized by Unjustifiable Delay*

44.     Paragraph 6 of the 2013 Consent Decree requiresd BLM to consider proposed actions that would (1) change the Salt Wells HMA to a herd area that is managed for zero wild horses, with gathers required if more than 200 wild horses are within the herd area; (2) change the Great Divide Basin HMA to a herd area that is managed for zero wild horses, with gathers required if more than 100 wild horses are within the herd area; (3) change the Adobe Town HMA AML to 225-450 wild horses or lower; and (4) manage the White Mountain HMA as a non-reproducing herd by utilizing fertility control and sterilization methods to maintain a population of 205 wild horses. *Id.* at 1; ECF No. 92-1, 2013 Consent Decree at ¶ 6. These were the conditions necessary to conform to Section 4 of the WHA and the extent of RSGA's consent to allow wild horse management on its private lands.

45.     The above changes incorporated the fact that about half of the land comprising the Great Divide Basin and Salt Wells HMAs were in the Checkerboard and it was not possible to isolate the remaining public lands without violating the Unlawful Inclosures Act, 43 U.S.C. §§1061-1066, which prohibits the fencing of public lands. Moreover, fences around each section would impede wildlife migration. Thus, BLM could not excise the private land and manage just parts of the current HMAs without violating federal law and harming wildlife. Converting the HMAs to herd areas was the best and only way to comply with Section 4 of the WHA and other federal laws.

46.     In accordance with Paragraph 6 of the Consent Decree, BLM filed a notice to amend wild horse management as part of the Rock Springs land use plan revision, which started in the fall of 2011. A month after publication of the notice, BLM suspended work on the plan revision and did not resume until the winter of 2016. BLM has still not published a Rock Springs draft of the plan revision nor has it indicated, when and if, a draft of the plan revision will be made public.

47.     Based on BLM delays in the Rock Springs resource management plan revision from 2013 to 2016, RSGA asked BLM to separate the wild horse plan amendment from the RMP process. BLM declined each timeuntil it was five years into the amendment process without a draft.

48.     BLM acknowledged the problems that delays in the plan revision presented, in May 2019, when it decided to issue a separate EIS for the wild horse management plan amendment. BLM released the Draft EIS for the wild horse management plan amendment in January 2020.

49.     The Rock Springs Field Office assumed that Paragraph 6 of the 2013 Consent Decree did not require removal of the private land from the HMAs and instead proceeded under the assumption that BLM need only consider the changes to comply with the 2013 Consent Decree and. The Rock Springs Field Office also assumed that Section 4 of the WHA allowed BLM to include and manage private land for wild horses without the landowner's consent. This assumption contradicted the rulings of this Court and the Tenth Circuit.

Based on this assumption, draft EIS treated the elements of the Consent Decree as an a la carte menu, and did not consider all of these actions in one alternative. Under the draft EIS, none of the action alternatives would have implemented the 2013 Consent Decree and none took into consideration RSGA's revocation of consent to allow wild horses on its private land within the

*RSGA Petition Under Section 4 of the WHA to Remove*
                                                          *Wild Horses and Private Land Interests from Wild Horse Management*

~~Checkerboard or to have its private land be managed~~ that BLM had to respect private land rights and could not manage the private lands for wild horses without the consent of the landowner. It is undisputed that RSGA withdrew that consent in October 2010. As the Tenth Circuit Court noted, the solution to the management problem on the Checkerboard is amendments to the areas designated as HMAs as requested in the 2013 Consent Decree. *AWHC v. Jewell*, 847 F.3d at 1189 n.8, 1192.

50.     The draft EIS treated the elements of the Consent Decree as an *a la carte* menu, and did not consider all of the HMA revisions actions in one alternative. Under the draft EIS, none of the action alternatives would have fully implemented the 2013 Consent Decree and none took into consideration RSGA's revocation of consent to allow wild horses on its private land within the Checkerboard or to have its private land be managed for wild horses.

51.     The DEIS also converted the White Mountain HMA to a herd area even though RSGA and BLM agreed to keep White Mountain HMA ~~as non-reproducing, because it~~so long as the herd numbers were maintained through fertility controls. This HMA is near Rock Springs and offered opportunities for the public to watch the wild horses. BLM advanced various reasons for disregarding RSGA's consent, including that wild horse contraception was too controversial, the Tenth Circuit held no wild horses could be maintained on the Checkerboard, or that management would be too difficult.

52.     BLM ~~made significant changes to~~completed the Final EIS for the wild horse management RMP amendment by December 2020. The Rock Springs Field Manager wrote to the ~~Sweet water~~Sweetwater County Commission that the notice ~~for~~of availability of the ~~Federal Register was~~proposed plan and FEIS were ready for publication in the Federal Register on January 29, 2021.

BLM nevertheless delayed publication of the Notice of Availability based on ~~the new Administration review, which called for a six-month review of pending rules, policies and decisions. BLM did not however~~Executive Order 13990, directing all agencies to review all actions proposed in the previous four years. Even though the FEIS implemented a consent decree and was consistent with federal law, BLM did not release the FEIS until May 6, 2022, some 15 months later.

53.    On September 7, 2022, BLM rejected all of the protests filed regarding the wild horse plan amendment but ~~has made no move to~~did not sign the ~~Record of Decision~~Wild Horse ROD until May 8, 2023. The State Director held meetings with RSGA on November 18, 2022 for purpose of better understanding the concerns expressed in the protest of the draft plan amendment and FEIS. The State Director failed to disclose that all protests had been rejected as of September 7, 2022, ~~or~~ two months earlier. The protest reports were made public November 30, 2022 but BLM continued to withhold the Wild Horse ROD.

54.    The Wyoming State Director admitted to RSGA that the ~~Record of Decision will~~Wild Horse ROD would not be released until after the expiration of the 2013 Consent Decree. The State Director also acknowledged that wild horse groups will challenge the plan amendment~~, thus preventing~~ and BLM would again delay implementation of the changes in management. ~~Completing~~

55.    Completion of the plan revision ~~will~~does not remedy the injury to RSGA in light of the government's position that land use plans are not a mandate.~~2~~ and BLM cannot be compelled to gather wild horses in accordance with the numbers established in the land use plan. *State of Wyoming v. Dep't of the Interior*, 847 F3d at 945.

*Record of Decision for Wild Horse Management BLM Rock Springs and Rawlins Field Offices*

*RSGA Petition Under Section 4 of the WHA to Remove Wild Horses and Private Land Interests from Wild Horse Management*

56.     On May 8, 2023 BLM signed and released the Record of Decision and Approved Resource Plan Amendment for Wild Horse Management BLM Rock Springs and Rawlins Field Offices (Wild Horse ROD). The Wild Horse ROD conformed to the 2013 Consent Decree except for the White Mountain HMA, which will not be managed as a non-reproducing herd. Wild Horse ROD at 23. The Wild Horse ROD states that it had no obligation to follow the conditions in the Consent Decree, merely to consider them. Wild Horse ROD at 8.

57.     RSGA conditioned its consent to manage wild horses on the private lands in the White Mountain HMA on BLM's agreement the herd would be non-reproducing. RSGA imposed the condition, because White Mountain HMA shares unfenced boundaries with RSGA lands to the east and south. If White Mountain HMA wild horse numbers were not maintained, the wild horses could and would drift onto other RSGA lands. BLM population suppression methods, which have been used for the past 20 years have largely failed. This failure can be traced to the institutional inability to administer annual booster shots to each mare originally vaccinated.

58.     RSGA wrote BLM on May 15, 2023 to revoke its consent to allow its private lands to be managed for wild horses within the White Mountain HMA. RSGA reiterated its insistence that BLM proceed to immediately remove the wild horses from its lands pursuant to Section 4 of the WHA.

59.     On May 10, 2023 the American Wild Horse Campaign, Animal Welfare Institute, Western Watersheds Project and several individual filed suit to challenge the ROD and the FEIS. *American Wild Horse Campaign et al. v. Stone-Manning, et al.*, Civ. No. 23-0084 NDF. The plaintiffs allege that the ROD and FEIS violate the WHA, FLPMA, and NEPA and ask this Court

to set aside the plan amendment to allow the wild horses to remain on the Checkerboard, including the RSGA private lands.

*RSGA Efforts to Resolve Dispute with BLM*

60.     The 2013 Consent Decree requiresd written notice of any matter in dispute under the agreement and an attempt to resolve the dispute informally for a period of 30 days from the date of the notice. *RSGA v. Salazar*, ECF No. 92-1, Consent Decree at ¶ 9.

61.     On December 7, 2020, RSGA formally notified the BLM by letter that it was not in compliance with the 2013 Consent Decree. RSGA based the violations on the BLM's failure to gather wild horses from private lands under Section 4 of the WHA, continued management of the wild horses at AML pending the completion of the plan amendment, failure to adjust its annual work plan in 2019 and 2020 to gather wild horses, and failure to conduct a census of wild horses in 2020. RSGA expressed its disappointment that BLM had failed to complete the plan amendment.

62.     The BLM responded on January 8, 2021, claiming that it was complying with the terms of the 2013 Consent Decree. The BLM stated that it was prioritizing the amendment to the Rock Springs RMP to satisfy the terms of the Consent Decree. The BLM also said that wild horse gathers on the Checkerboard have been difficult, since the Tenth Circuit held that the WHA required the BLM to comply with Section 3 before conducting a gather from the HMAs. The BLM also pointed to a planned gather to bring wild horse numbers within the HMAs to low AML in 2021. BLM did not acknowledge that BLM routinely authorized gathers pursuant to both sections of the law for several decades and did not previously find it "difficult." Nor did BLM recognize that the gathers left wild horses on the Checkerboard in contravention of the 2013 Consent Decree.

*RSGA Petition Under Section 4 of the WHA to Remove*
                                                            *Wild Horses and Private Land Interests from Wild Horse Management*

63.     The chronology of the plan amendment starting in 2013 to the present contradicts BLM claims to have made completion of the plan amendment to revise the HMAs a priority. Instead, BLM has engaged in intentional delay and foot-dragging to run out the clock on the 10-year consent decree. The pattern of delay is especially clear between January 2021 and May 2023.

64.     The claimed difficulty in complying with Section 3 and Section 4 of the WHA does not excuse the BLM failure to take effective action or to ignore its legal responsibilities. With the exception of the 2014 gather, BLM has always complied with Section 3 and Section 4 of the WHA and before 2017, BLM never claimed it was too difficult to comply with both sections of the law.

65.     RSGA has met with and communicated with BLM officials including the State Director throughout the implementation of the 2013 Consent Decree and certainly in the last three years. In early 2023, the State Director acknowledged to RSGA that the number of wild horses did not conform to the Consent Decree or RSGA rights but stated there will be no gathers this year or the next in the Rock Springs Field Office. Thus, BLM will did not adjust its work plan to address the excess number of wild horses on RSGA lands and will continues to manage the private lands as part of the HMAs regardless of RSGA's revocation of its consent. BLM's refusal to take action contradicts contradicted  the terms of the 2013 Consent Decree and violates Section 4 of the WHA. Before filing this action, RSGA communicated with and met with the State Director several times. The meetings did not yield either a final plan amendment or concrete schedule for future gathers necessary to comply with Section 4 of the WHA.

66.     Before filing this Petition, RSGA sent a notice of violation on February 21, 2023, in accordance with the Consent Decree to invite a discussion. RSGA counsel has not even never

*RSGA Petition Under Section 4 of the WHA to Remove*
                              *Wild Horses and Private Land Interests from Wild Horse Management*

received the courtesy of an acknowledgment of the letter ~~in the past 30 days~~. RSGA's May 15 2023 withdrawal of consent for the White Mountain HMA has also gone unacknowledged.

### FIRST CLAIM

### VIOLATION OF SECTION 4 OF WILD FREE-ROAMING HORSES

### AND BURROS ACT

67.     Petitioner RSGA realleges and incorporates by reference the allegations in Paragraphs 1 through ~~58~~66.

68.     The Administrative Procedure Act, 5 U.S.C. § 706 provides:

The reviewing court shall— (1)compel agency action unlawfully withheld or unreasonably delayed; and (2)hold unlawful and set aside agency action, findings, and conclusions found to be— (A)arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" . . . (C)in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

69.     Pursuant to Section 4 of the WHA, if wild horses stray from public lands onto privately owned land, the BLM "shall arrange to have the animals removed" upon the landowner's request. 16 U.S.C. § 1334. The BLM must remove wild horses from RSGA's private lands upon request pursuant to Section 4 of the WHA. 16 U.S.C. § 1334.

70.     Section 4 also prohibits BLM from managing private land as part of an HMA, if the landowner does not consent. 43 C.F.R. §4710.4; H-4700-1 §2.1.4 (exclude private land from HMA without landowner consent). As this Court recognized, the Checkerboard ownership creates land management challenges but it does not "deprive RSGA of its rights as a private landowner under Section 4 of the Wild Horses Act" or excuse the BLM from its ~~"statutorily obligat"~~"obligat[ion] to manage wild horses in this area consistent with RSGA's Section 4 legal rights." *RSGA v. Salazar*,

*RSGA Petition Under Section 4 of the WHA to Remove*
*Wild Horses and Private Land Interests from Wild Horse Management*

935 F. Supp. 2d at 1187-88. The Tenth Circuit recognized that the BLM needs to find a workable solution to the problems imposed by the Checkerboard, with that solution coming in the "form of amendments to the areas designated as HMAs, and/or to the AMLs applicable to the HMAs at issue" as proposed under the 2013 Consent Decree. *AWHPC v. Jewell*, 874 F.3d at 1189 n.8.

71.     In Paragraph 1 of the 2013 Consent Decree, the BLM ~~also~~ agreed to remove all wild horses located on RSGA's private lands, including the Checkerboard lands, except for the horses found within the White Mountain HMA. ECF No. 92-1, 2013 Consent Decree at ¶ 1. Paragraph 4 also would require the BLM to remove wild horses from the Checkerboard lands if the populations exceeded 200 wild horses for the Salt Wells/Adobe Town herd areas or 100 wild horses for the Great Divide Basin herd area. *Id.* at ¶ 4. Nothing in the Consent Decree waived RSGA's right to notify BLM to remove all wild horses from its private lands under Section 4 of the WHA. *Id.* at ¶ 7.

72.     As reported by BLM, the wild horse populations within the Checkerboard are currently three times higher than the numbers of wild horses established with the original HMA designations and clearly violate RSGA's land rights under Section 4 of the WHA by forcing RSGA to support wild horses on its land without consent.

73.     BLM continues to manage the RSGA private land as part of the HMAs regardless of RSGA's revocation of its consent in 2010 and, as supplemented on May 15, 2023. The BLM's continued disregard to RSGA's revocation of consent to allow wild horses on its private land within the Checkerboard violates Section 4 of the WHA and te implementing rules.

74. The BLM's historic and continued failure to ~~appropriately~~ manage the wild horses across the Wyoming Checkerboard frustrates the RSGA's conservation grazing management and threatens the thriving natural ecological balance across the range in southwestern Wyoming.

75. ~~Most of the~~RSGA was established more than 100 years ago to protect the winter range within the Checkerboard. RSGA limited grazing on its lands to sheep during the winter months and cut the number of sheep from 800,000 to 310,000 head in the first 10 years. Upon enactment of the Taylor Grazing Act (TGA), 43 U.S.C. §§315-315n (1934), RSGA qualified for the permit to graze livestock on the public lands within the Checkerboard and adjacent public lands. RSGA continued to implement its conservation grazing system on both the private and public lands.

76. Because RSGA limited livestock grazing on the Checkerboard to the winter months, the grazing system left the sensitive spring vegetation for wildlife and facilitated the health of native plants. These limits remain in place more than 110 years later. RSGA shareholders continue to primarily graze sheep and small number of cattle from December 15 to May 15. Shareholder grazing is now 66,817 sheep from December 1 to May 1. The highest number of cattle are on the Checkerboard from May 1 to May 15. RSGA's actual use has been about a half or less of authorized use particularly during drought. Dormant season grazing and RSGA shareholder willingness to reduce numbers have enabled RSGA to partially mitigate the wild horse resource impacts.

77. RSGA has suffered and continues to suffer from the violation of its legal rights under Section 4 of the WHA, which requires BLM to remove private land from wild horse management and to removal wild horses from the private lands upon request by the private landowner. While BLM undertook a few gathers (four in 10 years), the number of wild horses after the FY 2022 gather

*RSGA Petition Under Section 4 of the WHA to Remove*
*Wild Horses and Private Land Interests from Wild Horse Management*

demonstrate the colossal failure of the wild horse program. BLM at no time proceeded to program a gather when numbers exceeded AML. BLM failed to follow the direction of the Tenth Circuit to respect the rights of the private landowners and to come up with a solution. As Judge McKay wrote: "The BLM must "go back to step one and make appropriate judgements by redetermining the HMAs without the non-permissive use of private lands.") *AWHPC v. Jewell*, 847 F.3d at 1188, 1191.

78.     Despite the unambiguous mandates in Section 4 of the WHA and clear legal direction, BLM inexplicably spent another seven years to prepare a plan amendment outlined in the 2013 Consent Decree. This delay coupled with the failure to honor the obligation to gather as soon as numbers exceeded above AML necessitates the withdrawal of all consent to use private lands for wild horse management.

79.     BLM failure to follow the law has occurred despite the adverse impacts of wild horse numbers well above AML, and the harm to Greater Sage Grouse priority habitat, big game habitat, and rangeland resources. BLM's inaction contrasts with RSGA shareholders, who sold herds and took reduced numbers in recent years due to the severe drought and wild horse numbers within the Wyoming Checkerboard.

80.     The HMA acres overlap big game habitat and a significant percent of the HMA acres are within Greater ~~sage-grouse~~ Sage Grouse priority habitat management areas, with most of the remaining acres ~~are~~ managed as general habitat management areas.

81.     Research ~~compiled by other federal agencies, including the U.S. Fish and Wildlife Service,~~ conclude~~s~~ that grazing by wild horses can severely impact water quality, aquatic ecosystems, and riparian communities that are associated with the Greater ~~Sage-Grouse~~ Sage Grouse. *See e.g.* K.

Davies, C. Boyd, *Ecological Effects of Free-Roaming Horses in North American Rangelands*, 69 BIOSCIENCE 558 (July 2019). The BLM 2021 EA recognizesd that increased wild horse populations are "associated with decreasing greater sage-grouse population sizes." 2021 Wild Horse Gather EA at 61.

82.    ~~Extensive research confirms the~~Wild horses or feral equids have unique and adverse impacts ~~of wild horse grazing~~ on rangeland resources and wildlife habitat, especially Greater Sage Grouse. The impacts arise from the differences in grazing mechanics by which wild horses consume most of the plant's seasonal growth, the wide range of wild horse diets that will include less-desirable species like sage brush during drought, year-round grazing patterns, and territorial nature that will drive out other big game. ~~RSGA has presented this research to BLM in its comments on wild horse gathers and the FEIS. BLM is independently aware of the research~~*Greater Sage Grouse Conservation Objectives: Final Report* (U.S. Fish and Wildlife Service 2013) at 46-47.

83.    Since 1995, grazing permittees including RSGA must demonstrate that their activities meet, maintain or make progress towards meeting Wyoming Standards for Healthy Rangelands. 43 C.F.R. § 4180.2. The rangeland resources suffer when there are too many wild horses. Livestock operators including RSGA shareholders only graze in the dormant season, late fall and winter while the wild horses graze year-round. Livestock are also moved through the allotment and sheep move in bands without staying in a single location.

for more than a few days.

84.    In September 2015, BLM designated Greater Sage Grouse priority habitat management areas, which included lands in the White Mountain, Salt Wells Creek, Adobe Town and

*RSGA Petition Under Section 4 of the WHA to Remove Wild Horses and Private Land Interests from Wild Horse Management*

Divide Basin HMAs. Research identifies feral equids (wild horses) as a significant threat to Greater Sage Grouse habitat. Wild horses favor grasses and forbs that provide understory for insects in the spring and support soil and moisture regimes for sage brush. During drought wild horses will consume sage brush.

85.    The adverse impacts of too many wild horses fall on both private and public lands. The high number of wild horses also interfere with maintaining or moving towards rangeland health standards or other range standards established for Greater sSage gGrouse habitat.

86.    The excess wild horse numbers impact to the thriving natural ecological balance and sage-grouse habitat is increased by the current drought conditions of southwestern Wyoming. Sweetwater County was designated as in drought from 2020 through 2022, with areas ranging from abnormally dry to severe drought. *See* National Oceanic and Atmospheric Administration's National Integrated Drought Information System, *Current U.S. Drought Monitor Conditions for Wyoming*, https://www.drought.gov/states/wyoming. While 2023 has reduced the area to moderate drought and abnormally dry, (updated Mar. 21, 2023) the impacts of the previous years remain.

87.    The BLM has failed to honorcomply with the key mandate in Section 4 of the WHA, removal of wild horses from the Checkerboard and the removal of RSGA's private lands from wild horse management. Because the Checkerboard lands cannot be fenced for legal and wildlife reasons, this also means that herd management areas cannot include private lands when the private landowner does not consent. RSGA is entitled to a judgment that Section 4 of the WHA compels BLM to remove the wild horses and permanently enjoin BLM from managing the RSGA private lands within the Wyoming Checkerboard for wild horses.

*RSGA Petition Under Section 4 of the WHA to Remove Wild Horses and Private Land Interests from Wild Horse Management*

SECOND CLAIM

**VIOLATION OF THE 2013 CONSENT DECREE**

Petitioner RSGA realleges and incorporates by reference the allegations in Paragraphs 1 through 73.

BLM'S failure to amend the HMA boundaries and AMLs to conform to RSGA'S withdrawal of consent to allow wild horses on its private lands violates the terms of the 2013 Consent Decree.

The 2013 Consent Decree required the BLM to revise the land use plan to reflect RSGA's revocation of consent to have wild horses on its land. While the BLM did initiate scoping to amend the RMPs in 2013, the BLM has arbitrarily delayed the process over the past 10 years. This contradicts the letter, the intent, and the spirit of the 2013 Consent Decree.

Initiating scoping without actually producing a final plan revision for almost 10 years does nothing to address the serious issues caused by over-population of wild horses that led to RSGA withdraw its consent to allow wild horses on its private lands The Section 4 mandate entitles RSGA to a writ of mandamus to BLM directing the agency to act.

88.     RSGA's revocation of consent to allow wild horses on its private land within the Checkerboard requires the BLM to revise the HMA boundaries and, as a result, the AMLs for each HMA. As Judge McKay wrote in 2016:

> The problem that keeps bringing this matter to the court arises from the one section of the act which is clear, unmistakable, mandatory, and non-discretionary: Section 4. Under this section, private landowners have the absolute right to exclude wild horses and burros from their land. If they do not consent, then by definition, their lands with their corresponding forage may not be included in the decision about herd size or at the primary decision level which is the designation of herd management

areas (HMAs). It seems to me that the only way the BLM can ultimately lawfully achieve its Section 3 duty to maintain wild herds and prevents destruction of viability caused by over grazing on public lands is to go back to step one and make appropriate judgments by redetermining the HMAs without the non-permissive use of private lands.

*AWHPC v. Jewell*, 874 F.3d at 1191 (J. McKay concurring).

89.     The BLM cannot continue to manage the Checkerboard lands for wild horses. As this Court previously recognized, "BLM is statutorily obligated to manage wild horses in this area consistent with RSGA's Section 4 legal rights notwithstanding the RMP herd management objectives for federal land, or the particular management challenges presented." *RSGA v. Salazar*, 935 F. Supp. 2d at 1187-88. The Tenth Circuit further recognized that the BLM needs to find a workable solution to the problems imposed by the Checkerboard, with that solution coming in the "form of amendments to the areas designated as HMAs, and/or to the AMLs applicable to the HMAs at issue" as proposed under the 2013 Consent Decree. *AWHPC v. Jewell*, 874 F.3d at 1189 n.8.

90.     The original HMA boundaries and AMLs were predicated on RSGA consent to wild horses roaming on their private lands. RSGA revoked its consent to allow wild horses on its private land, and as such, this land area must be removed from the HMA boundaries and the AMLs adjusted accordingly to reflect the reduced acreage available for the wild horses. The BLM can no longer evade the promises made under the 2013 Consent Decree and must complete and implement the revisions to wild horse management in the Rock Springs and Rawlins Field Offices that it initiated in 2013.

**RELIEF REQUESTED**

*RSGA Petition Under Section 4 of the WHA to Remove Wild Horses and Private Land Interests from Wild Horse Management*

Wherefore the Petitioner RSGA seeks ~~a~~ declaratory ~~judgment~~and injunctive relief based on the determination that:

1.  BLM violated the mandates in Section 4 of the WHA by failing to remove wild horses from the private lands despite the lack of consent to maintain wild horses on the private lands and multiple and repeated requests to remove them and by failing to revise the HMA boundaries to in order to cease and desist from managing the private lands from wild horse herd management areas;

2.  ~~BLM failed to comply with its obligations under Paragraphs 1, 4, and 6 of the 2013 Consent Decree by failing to gather wild horses on RSGA's private lands, to remove wild horses from the Wyoming Checkerboard, and to timely complete the Rock Springs and Rawlins RMP revisions for wild horse management that were initiated in 2013.~~

3.  ~~As a result of~~In light BLM violations of law ~~and the 2013 Consent Decree,~~ wild horse numbers are at an all time high ~~within~~on the ~~subject HMAs~~RSGA private lands and these numbers are and will likely adversely impact the vegetation, wildlife habitat, and rangeland resources;

~~4~~3.  BLM is permanently enjoined from further violations of the WHA and specifically enjoined from managing the private lands in the Wyoming Checkerboard ~~lands~~ for wild ~~horse management~~horses and must proceed to remove all wild horses from the lands in the Wyoming Checkerboard and continue to gather the wild horses in the future to avoid violations of the law; ~~and BLM must implement the revision of the~~

*RSGA Petition Under Section 4 of the WHA to Remove*
*Wild Horses and Private Land Interests from Wild Horse Management*

~~HMA boundaries to exclude all Checkerboard lands; institute wild horse gathers to remove all wild horses found within the Checkerboard; and continue wild horse gathers on an annual basis to maintain the removal of all such wild horses and cease and desist from managing private lands for wild horse management within the Wyoming Checkerboard;~~

~~5.      In the alternative, the 2013 Consent Decree shall be extended for 10 years to enforce the BLM legal obligations under the terms of the 2013 Consent Decree and~~

4.      A writ of mandamus shall also issue commanding BLM to comply with Section 4 of the WHA~~.~~ in regards to RSGA private lands;

64.      Attorneys' fees and costs ~~and legal fees~~ as authorized by law ~~to enforce the terms of the Consent Decree and the WHA.~~;

75.      Such other equitable relief as may be appropriate.

Respectfully submitted,

/s/  Constance E. Brooks
Constance E. Brooks (*pro hac vice ~~pending~~*)
cbrooks@fwlaw.com
Danielle Bettencourt (WY Bar No. 8-6782)
dbettencourt@fwlaw.com
FAIRFIELD & WOODS, P.C.
1800 California Street, Suite 2600
Denver CO 80202-2645
P: (303) 894-4431 F: (303) 830-1033

Galen West (WY Bar No. 5-1453)
West Law Office, P.C.
P.O. Box 1020
Rock Springs, WY 82902
galen.west@westlawofficepc.com
P: (307) 362-3300

*RSGA Petition Under Section 4 of the WHA to Remove Wild Horses and Private Land Interests from Wild Horse Management*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 23, 2023 I electronically filed the foregoing Petitioner's AMENDED PETITION  TO ENFORCE RIGHTS UNDER SECTION 4 OF THE WILD FREE-ROAMING HORSES AND BURROS ACT with the Clerk of the Court using the CM/ECF system which will send notification of this filing to all counsel of record.

/s/ Constance E. Brooks
CONSTANCE E. BROOKS

*RSGA Petition Under Section 4 of the WHA to Remove*
*Wild Horses and Private Land Interests from Wild Horse Management*